**ASSOCIATED MILK DEALERS, INC.,**
et al., Plaintiffs-Appellees,

v.

**MILK DRIVERS UNION, LOCAL 753,**
**INTERNATIONAL BROTHERHOOD**
**OF TEAMSTERS, CHAUFFEURS,**
**WAREHOUSEMEN & HELPERS OF**
**AMERICA,** Defendant-Appellant.

No. 17577.

United States Court of Appeals,
Seventh Circuit.

Feb. 6, 1970.

Stephen A. Schiller, Solomon I. Hirsh, Joseph M. Jacobs, Albert Gore, Judith A. Lonnquist, Chicago, Ill., for defendant-appellant; Jacobs & Gore, Chicago, Ill., of counsel.

Robert E. Cronin, William B. Hanley, Chicago, Ill., for plaintiffs-appellees; MacDonald & Hanley, Chicago, Ill., of counsel.

Before DUFFY, Senior Circuit Judge, and SWYGERT and FAIRCHILD, Circuit Judges.

SWYGERT, Circuit Judge.

This appeal concerns a suit brought under section 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a), by the Associated Milk Dealers, Inc., (AMDI), a trade association of milk dealers, against the Milk Drivers Union, Local 753, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America. Various dairies, allegedly members of AMDI, intervened as plaintiffs. The suit alleged that the union breached its collective bargaining agreement, a standard Chicago area contract with individual dairies, by refusing to submit a dispute to arbitration. The district court granted plaintiffs' motion for summary judgment and ordered the union to comply with the grievance and arbitration provisions of the agreement. Because genuine issues of material fact exist concerning the duty of the union to arbitrate the dispute in question and concerning the legality of the agreement under the antitrust laws, we reverse the district court's grant of summary judgment and remand for trial.

The appellant union represents delivery men employed by dairies and milk dealers in the Chicago area. The appellee, AMDI, is a nonprofit corporation which represents independently owned milk dealers in negotiating collective bargaining agreements with labor organizations. When a standard area contract is arrived at by the union and AMDI, individual milk dealers and not AMDI sign the agreement.

In February 1967 the union entered into negotiations for a new standard area contract. AMDI and another employer association, Chicago Area Dairymen's Association, (CADA), as well as a number of individual employers participated in the discussions. On August 29, 1967 AMDI, CADA, and the union signed a memorandum evidencing agreement to changes in the former contract.

Copies signed by the union were sent to each employer for signature. The contract, effective from May 1967 to May 1970, was signed by the individual dealer plaintiffs in this action.

The new contract, as set out in the memorandum, contained the following provision:

> The Union shall furnish the Dealers a letter of understanding that if certain conditions come into the market which would create an inequitable situation relative to store operations, they would meet with the dealers for the purpose of negotiating an appropriate adjustment of the situation.

Pursuant to this provision, a memorandum of understanding was executed by AMDI, CADA, and the union on October 6, 1967. The memorandum reads in pertinent part:

> If certain conditions come into the market, which would create an inequitous (*sic*) situation relative to the store operations, or a similar situation effecting retail, the Union will meet with the Dealers upon written request for the purpose of negotiating an appropriate adjustment of the situation.

Although the parties differ as to the effect to be given the contract provision and the memorandum of understanding, they seem to agree that both writings contemplated the entry of Jewel Food Stores into the milk processing market in Chicago.

On July 11, 1968 the union entered into an agreement with Hillfarm Dairy of the Jewel Food Stores Division, Jewel Companies, Inc. Hillfarm is a milk processor wholly owned by Jewel and serves Jewel Food Stores exclusively. The union contract with Hillfarm differed substantially from the standard area contract entered into the year before with the independent milk dealers.

On July 25, 1968 William B. Hanley, attorney for AMDI, stated in a letter to the union that many provisions of the Hillfarm contract were more advantageous than those in the standard area contract and that the milk dealers would adopt those terms pursuant to Article 20, the "most favored nation" clause, in their contract. Article 20 reads as follows:

> Should the Union hereafter enter into any agreement with any milk dealer upon terms and conditions more advantageous to such dealer than the terms and conditions of this Agreement, or should the Union sanction a course of conduct by any milk dealer who has signed this form of agreement enabling him to operate under more advantageous terms and conditions than those provided for in this Agreement the Employer shall be entitled to adopt such terms and conditions in lieu of those contained in this Agreement.

At a meeting on July 30 the union refused to accede to this demand, maintaining among other things that the memorandum of understanding governed any inconsistencies between the standard area contract and the Hillfarm contract and that it was prepared to negotiate as required by the memorandum. On August 2, AMDI and CADA requested[1] that the union comply with Article 6 of the standard area contract which provides:

> Any matter in dispute, between the Union and Employer [excepting wages and hours, as set forth in Articles 4, 37 and 41, and contributions to all existing Funds, as set forth in Articles

---

1. The demand was made in a letter sent jointly by Mr. Hanley, and Morgan F. Murphy, Jr., attorney for CADA, which read in pertinent part:
We have now been informed through our meeting of July 30, and Mr. Jacob's letter of July 29, that we are not in agreement either as to the interpretation and application of Article 20 of our contract or as to our understandings reached through the process of our last collective bargaining sessions.
Therefore, we request compliance with Article 6 of our Agreement which provides a method of settling disputes over terms and conditions of our Agreement.

45, 47 and 48 and questions of jurisdictional matters, as decided by Teamsters Joint Council No. 25, which cannot be settled], shall be referred by either party to an Industry Labor Committee consisting of three [3] representatives of Employers, parties to this Agreement, and three [3] representatives of the Union. It shall be the duty of this Committee to hear and dispose of all complaints raised by either party to this Agreement concerning violations thereof that cannot be settled amicably between the parties. If this Committee is equally divided on any such complaint the Chief Justice of the Circuit Court or his nominee shall be called in to act as the impartial member of said Committee, and his decision shall be final. No action shall be taken by either party to the Agreement pending the decision of this Committee.

The union refused.

On August 20, AMDI filed this suit.[2] requesting that an arbitrator be appointed to determine whether Article 20 of the contract provided for adoption by its members of the more favorable terms contained in the Hillfarm contract. After various preliminary motions, the district court characterized the dispute between the parties as whether Hillfarm was a "milk dealer" within the terms of Article 20 of the contract. At the court's suggestion AMDI moved for summary judgment. On February 24, 1969 the district court granted the motion and ordered the union to comply with Article 6.

We think the standard area contract and the memorandum of understanding issued pursuant to it present genuine issues of material fact concerning whether the parties agreed to arbitrate disputes arising out of the contract between Hillfarm and the union. The district court's findings in support of its order, announced from the bench, did not mention the memorandum of understanding and instead relied only upon the broad language of Article 6, the arbitration clause. The court's reliance upon Article 6 can be interpreted in two ways: (1) that under the broad language of Article 6, the question of arbitrability was for the arbitrator and not the court; or (2) that the memorandum of understanding and the similar contract clause were not sufficiently specific for the court to rule that these provisions were designed to exclude arbitration over the dispute concerning the contract between Hillfarm and the union.

The language of Article 6 is not so broad as to make arbitrability a question for the arbitrator. Though strongly favoring arbitration, the Supreme Court in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547, 84 S.Ct. 909, 913, 11 L.Ed.2d 898 (1964), stated, "[t]he duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty." The district court must determine whether the dispute between the parties is arbitrable, United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), unless the parties voluntarily submit arbitrability to the arbitrator. Metal Products Workers Union, Local 1645 v. Torrington Co., 358 F.2d 103, 105 (2d Cir.1966). The party claiming that arbitrability is for the arbitrator to decide bears the burden of proof and must show that the contract clearly manifests such an intention, United Steelworkers v. Warrior & Gulf Navigation Co., supra 363 U.S. at 583 n. 7, 80 S.Ct. 1347. AMDI has not satisfied this burden. The reference in Article 6 to "[a]ny matter in dispute" is insufficient, without further evidence of intent or express mention of the question of arbitrability, to demonstrate that the parties intended the arbitrator to de-

2. On August 23, 1968 CADA filed a similar suit against the union. On September 9 the CADA suit was consolidated with AMDI's, but on January 23, 1969 CADA sought and obtained an order of voluntary nonsuit of its cause.

cide arbitrability. Strauss v. Silvercup Bakers, Inc., 353 F.2d 555, 557 (2d Cir. 1965); Torrington Co. v. Metal Products Workers Union, Local 1645, 347 F. 2d 93, 96 (2d Cir.1965). *See also* Drake Bakeries, Inc. v. Local 50, American Bakery & Confectionery Workers, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962).

■■ The district court should have allowed the parties to submit evidence concerning the effect to be given to the memorandum of understanding and the similar contract provision.[3] The Supreme Court has recognized that a contract clause or a written collateral agreement can exclude disputes from arbitration, United Steelworkers v. Warrior & Gulf Navigation Co., *supra* at 584, 80 S.Ct. 1347.[4] We think the contract and the memorandum of understanding here contemplate just such an exclusion although its scope is uncertain. Reference in the contract to meetings "with the dealers for the purpose of negotiating an appropriate adjustment of the situation" and in the memorandum of understanding to a similar meeting at the request of the dealers suggest negotiation through collective bargaining and not arbitration. The fact that Jewel or Hillfarm was not specifically mentioned is immaterial since both parties agree that the provisions in some way pertain to Jewel.

■ The Supreme Court has held, however, that language to exclude a dispute from arbitration must be specific, United Steelworkers v. Warrior & Gulf Navigation Co., *supra* at 585, 80 S.Ct. 1347; Sheet Metal Workers v. Barber-Colman Co., 379 F.2d 533, 536 (7th Cir. 1967). As the Second Circuit said when confronted with the same problem, "* * * it is not clear how specific the provision must be in order to

have this effect." Strauss v. Silvercup Bakers, Inc., *supra* 353 F.2d at 557.

■ AMDI contends that the standard area contract and the memorandum of understanding issued pursuant thereto called for negotiations only if Hillfarm signed a contract with a different union. In contrast, the union maintains that the contract provision and the memorandum contemplated negotiations concerning all disputes arising out of the entry of Jewel into the Chicago milk processing market. Both interpretations of the contract and memorandum of understanding are reasonable and plausible. The fact that two interpretations exist, one which would permit and the other prevent arbitration, does not mean that the district court must order the parties to proceed to arbitration. Strauss v. Silvercup Bakers, Inc., *supra* at 558. Bargaining history is relevant in determining whether parties intended to submit a particular dispute to arbitration. We have previously held that such evidence is admissible in an action to compel arbitration under section 301(a), Local 483, International Brotherhood of Boilermakers v. Shell Oil Co., 369 F.2d 526, 528 (7th Cir.1966); General Teamsters, Local 782 v. Blue Cab Co., 353 F.2d 687, 690 (7th Cir.1965). Here the district court should have considered parol evidence in order to determine the extent of the contractual duty to arbitrate under the contract and the memorandum of understanding.

■ In reaching this conclusion we are not unmindful of the broad caveat in Supreme Court decisions against court interpretation of substantive provisions of collective bargaining agreements and consideration of the merits of a dispute through the interpretation of an arbitration clause. United Steelworkers v. En-

---

3. The fact that the terms of Article 20 were previously held to be arbitrable under Article 6, Sidney Wanzer & Sons, Inc. v. Milk Drivers Union, Local 753, 249 F.Supp. 664 (N.D.Ill.1966), is therefore not determinative of the issue before the district court.

4. In Torrington Co. v. Metal Products Workers Union, Local 1645, *supra*, the Second Circuit held that an oral collateral agreement was sufficient to exclude matters from arbitration.

terprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); United Steelworkers v. Warrior & Gulf Navigation Co., *supra.* The question which the district court must decide upon remand of this case does not concern the merits of the dispute between AMDI and the union. Bargaining history concerning the merits of the dispute need not be considered, Local 12298, United Mine Workers v. Bridgeport Gas Co., 328 F.2d 381 (2d Cir.1964). The district court will not be required to interpret a broad exclusionary clause, (*e. g.*, concerning management's right to contract out work or to discharge employees) which inevitably involves consideration of the merits of the dispute; rather the court is called upon only to determine whether the parties intended to exclude a limited and particular dispute from arbitration. Regardless of the district court's ruling on arbitrability after evidence is presented, interpretation of Article 20 of the contract by an arbitrator in this or future cases will not be affected.

The union has presented another contention on this appeal which should be considered on remand of this case. The union argues that the most favored nation clause in the standard area contract violates the Sherman Act under United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and that the illegality of that clause constitutes a defense to its duty to arbitrate. The district court summarily dismissed this contention without stating reasons. In so doing we hold the district court erred.

Illegality under the Sherman Act is a defense of very limited applicability in an action based on contract. Kelly v. Kosuga, 358 U.S. 516, 518, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959); Wilder Manufacturing Co. v. Corn Products Refining Co., 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520 (1915). The same rule applies to labor contracts, Lewis v. Seanor Coal Co., 382 F.2d 437, 441 (3d Cir. 1967). A claim that the contract violates the Sherman Act is properly allowed as a defense to the enforcement of contractual duties only when the failure to do so would "make the courts a party to the carrying out of one of the very restraints forbidden by the Sherman Act." Kelly v. Kosuga, *supra* 358 U.S. at 520, 79 S.Ct. at 432; Continental Wall Paper Co. v. Louis Voight & Sons Co., 212 U.S. 227, 261, 29 S.Ct. 280, 53 L.Ed. 486 (1909).

Under this exception the illegality of a labor contract clause under the antitrust laws can be asserted as a defense to the duty to arbitrate concerning the interpretation to be given the provisions of the illegal clause. Although the court does not actually enforce the illegal provisions of the contract until the parties seek enforcement of the arbitrator's award, the court, by ordering arbitration, gives significant practical effect to the illegal clause. Furthermore, to await the arbitrator's award before allowing the defense of illegality to be raised would be contrary to sound policy. Illegality under the antitrust laws concerns broad public interests transcending the private objectives of the parties. To discourage private enforcement by requiring the parties to await the arbitrator's decision would be contrary to the objectives of the Sherman Act. *Cf.* Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

AMDI urges that violations of the antitrust laws could be considered by the arbitrator. We disagree. Arbitrators are ill-equipped to interpret the antitrust laws and their consideration of possible violations would add little. Indeed an agreement requiring arbitration of private antitrust claims would probably be unenforceable, Silvercup Bakers, Inc. v. Fink Baking Corp., 273 F.Supp. 159, 162 (S.D.N.Y.1967). Thus we hold that if the union can establish that Article 20, the most favored nation clause, is illegal under United Mine Workers v. Pennington, *supra,* arbitration of the dispute between the parties is not required.

In asserting that Article 20 violates the Sherman Act under the *Pennington* case, the union makes two arguments: (1) that most favored nation clauses are per se invalid under Pennington;[5] and (2) that the district court erred in refusing to allow the union to submit evidence concerning the similarity of a most favored nation clause to the agreement in the *Pennington* case and concerning the intent of the parties in negotiating Article 20. We hold that most favored nation clauses are not invalid per se, but remand to allow the union to present evidence concerning its second argument.

In its per se argument the union relies heavily on the words of Mr. Justice White whose opinion represents the views of three Justices in the *Pennington* case. According to the union's interpretation, a per se violation of the Sherman Act occurs whenever a union engaged in multiemployer bargaining agrees to impose the provisions of a contract between union and some employers upon other employers who are not parties to the contract. The union argues that this rule applies without regard to the purpose of the parties to the contract in imposing restrictions on the union's freedom to deal with employers not parties to the contract. It further maintains that the rule also applies to most favored nation clauses even though the restriction on a union's freedom to bargain is imposed indirectly rather than directly as in *Pennington*.

We do not think the *Pennington* case stands for the broad rule advanced by the union. Although some of the language of Mr. Justice White's opinion may lend support to the union's position, the actual holding of *Pennington* requires proof of the predatory purpose of the agreement between a union and the employers. Much of Mr. Justice White's opinion concerns itself with the scope of the labor exemption from the antitrust laws rather than with the elements required to make out a violation.[6] In holding that a violation could be proved on the basis of the evidence presented to the district court, however, Mr. Justice White emphasized the anticompetitive purpose of the United Mine Workers and the large coal operators in entering into the National Bituminous Coal Agreement. Furthermore, he relied also upon various other devices employed by the defendants to injure the plaintiff. United Mine Workers v. Pennington, *supra*. Mr. Justice Douglas, whose opinion also represents the views of three Justices, interprets Mr. Justice White's opinion as requiring proof of predatory purpose. Thus although collective bargaining agreements with extra-unit effects constitute prima facie evidence of illegality, the jury can find a violation only if it is proved that the agreement "* * * was made for the purpose of forcing some employers out of business." United Mine Workers v. Pennington, *supra*, 381 U.S. at 673, 85 S.Ct. at 1595. According to Mr. Justice Goldberg, whose concurring opinion in *Pennington* represents the views of the remaining three Justices, any other interpretation would run directly counter to the Congressional policy in favor of uniform wages and working conditions which prompted the enactment of the National Labor Relations Act, 381 U.S. 657, 699, 85 S.Ct. 1585, 14 L.Ed.2d 626

---

5. *See generally* Comment, Labor's Antitrust Exemption After Pennington and Jewel Tea, 66 Colum.L.Rev. 742 (1966); B. Meltzer, Labor Unions, Collective Bargaining and the Antitrust Laws, 32 U. Chi.L.Rev. 659 (1965).

6. Mr. Justice White described the scope of the labor exemption from the antitrust laws as follows:

"We have said that a union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers. * * * But we think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units." United Mine Workers v. Pennington, *supra*.

(1965). Therefore, a majority of the Supreme Court in *Pennington* requires proof of predatory purpose as a prerequisite to finding that a most favored nation clause violates the antitrust laws. *Cf.* Allen Bradley Co. v. Local 3, International Brotherhood of Electrical Workers, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945).

We believe the holding of Pennington also requires demonstration that most favored nation clauses operate in the same restrictive fashion as the agreement in that case. Without such proof we hesitate to say that the effect on competition is the same. Furthermore in this difficult area of conflict between labor and antitrust policy, appropriate policy considerations are best developed in a particular factual context.

Although the union has failed to demonstrate that most favored nation clauses are per se violations of the antitrust laws, the district court nevertheless erred in granting summary judgment on the union's antitrust claim. As previously indicated, compelling proof concerning the purpose of the adoption of Article 20 and its anticompetitive effect would be sufficient to make out a violation. In the district court the union requested an opportunity to present such evidence but was refused. In antitrust cases where, as here, intent and purpose play important roles, summary procedures should be avoided. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). We remand to allow the union to present evidence [7] on these questions.

The union raises a final point which deserves only brief mention. Since AMDI was not a party to the agreement between the milk dealers and the union, the union urges that this suit should have been dismissed by the district court or in the alternative AMDI should have been dismissed as a plaintiff. We disagree. Assuming without deciding that AMDI was not a proper plaintiff to enforce the terms of the standard area contract, such a defect was cured by the addition of various milk dealers, all parties to the contract, as plaintiffs. The continued presence of AMDI as a plaintiff after that point was at most a harmless misjoinder of parties.

The union further maintains, without citing authority, that a demand for arbitration is a precondition to commencement of a suit under section 301(a). The union presented affidavits to demonstrate that Mr. Hanley, attorney for AMDI, was without authority to represent milk dealers concerning disputes in the interpretation of the standard area contract and that at no time was he empowered to demand arbitration on behalf of individual milk dealers. We think the authority of Mr. Hanley is irrelevant.[8] Assuming arguendo that a demand for arbitration is required, we hold that the presence of milk dealers as plaintiffs constitutes a sufficient demand for arbitration in this case. A demand for arbitration serves only to provide notice of the nature of the dispute and to allow the party to comply before the commencement of costly litigation. The demand for arbitration by AMDI served this purpose. To require individ-

---

7. Remand of this case will allow AMDI also to present evidence. Evidence may be introduced concerning the relationship of Perma Life Mufflers, Inc. v. International Parts Corp., *supra*, to the union's antitrust claim in this case. *Cf.* Jewel Tea Co. v. Associated Food Retailers of Greater Chicago, 331 F.2d 547, 550–551 (7th Cir. 1964), rev'd on other grounds, sub nom., Local 189, Amalgamated Meat Cutters, AFL–CIO v. Jew-

el Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965).

8. Thus the conflict concerning Mr. Hanley's authority which clearly appears when the affidavits of Anthony Christiano, Robert Sugarman, and Albert Gore are compared with the testimony of Walter Hedin, John Linton, and Peter McCormick is not a material factual dispute requiring reversal under Fed.R.Civ. P. 56(c).

ual milk dealers to make perfunctory demands upon the union before joining as plaintiffs would be an excessively technical and meaningless gesture. Thus on remand this argument need not be reconsidered.

For these reasons the entry of summary judgment by the district court is reversed and this case is remanded for trial.